## Red Bush Production Co. v. Hayes.

March 7, 1939.

JAMES F. BAILEY, Judge.

WHEELER & WHEELER for appellant.

FRED HOWES and J. EARL WALKER for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

Appellant, Red Bush Production Company, is appealing from a judgment wherein it was adjudged that appellee, Mrs. Missouri Hayes, recover from it the sum

of $750 for injuries resulting from the inhaling of harmful gases which emanated from appellant's gas transportation line, and in which it was adjudged that appellant be perpetually enjoined and restrained from blowing its pipe line in such proximity to appellee's residence as to cause substantial damages or harmful results to her person or property. It is insisted that the summons was not properly served on appellant, and also that a peremptory instruction should have been given in its favor.

Sometime during the early fall of 1936, appellant began to pump a small amount of hydrogen sulphide gas into its transportation line. It seems that the output of one well, which produced hydrogen sulphide gas, was mixed with that of some 20 to 25 wells which produced carbon or sweet gas. While there is some conflict in the evidence on this point, it appears that a small amount of the hydrogen sulphide or sulphur gas was being pumped into the pipe line from the fall of 1936 up until the spring of 1937. After that date larger quantities of the sulphur gas were pumped into the pipe line. During the winter of 1936-1937 appellant was experimenting with the handling of the sulphur gas by mixing it with sweet gas so as to make it a marketable product. It was also cleaning out and preparing other sulphur gas wells it owned with the view of marketing the gas produced by them.

We had occasion to comment upon the commercial value of hydrogen sulphide or sulphur gas in the case of Southeastern Gas Company v. Ferguson, 269 Ky. 162, 106 S. W. (2d) 144, 146. In that case we said:

"The gas produced by this well is so highly charged with hydrogen sulphide that it has no commercial value. It has a very disagreeable odor and inflames the eyes of men who work about it, it is unsalable and it cannot be made salable, and for this reason the Southeastern Gas Company contends it received no consideration for this $550 and should have it back. We are persuaded this position is sound, and for the reason given above this money should be repaid and the court erred in not allowing this $550 counterclaim."

Appellant bought some of the wells referred to in the Ferguson case, supra, from the Southeastern Gas Company, and it was the output of one or more of these

wells that it was attempting to market by mixing it with carbon gas in the winter of 1936-37.

Appellant's transportation line passes in front of appellee's home at a distance of some 40 to 50 feet therefrom. Shortly after the sulphur gas was first pumped into the transportation line a hole was knocked in the line approximately 60 feet from appellee's home for the purpose of blowing the line. Fluids collect in gas lines at low places, and it is necessary for the lines to be blown from time to time in order that there may be a free and continuous flow of gas through the lines. Drips are frequently placed in the lines at points where fluids collect. According to the evidence it is necessary from time to time, however, to knock holes in a line at places other than where drips are placed in order to blow the line. The holes are plugged with wood or metal pegs, in some instances, and in others they are covered with band clamps. The hole in the transportation line in front of appellee's home was not stopped with a band clamp until sometime around the latter part of February, or the first of March, 1937. This suit was filed in January 1937.

When the hole in the pipe line near appellee's home was stopped, a drip was placed in the line a short distance therefrom. Witnesses for appellant stated that the drip was some 200 yards from appellee's home, while her witnesses testified that it was approximately 100 yards therefrom. It is impossible to tell from the record how often the pipe line was blown in front of the Hayes home. There is also some evidence that the peg in the hole blew out from time to time, thereby permitting gas to escape. Appellee's husband, Charlie Hayes, complained to appellant's employees about the blowing of the pipe line in front of his home, but, as indicated, the hole was not closed with a band clamp and the drip put in the line until about the first of March, 1937.

Missouri Hayes is past 50 years of age. According to the evidence she has been in poor health for a number of years. Dr. T. B. Bailey stated that he had treated her for several years, that she was very nervous, and that her condition was worse after appellant began to blow its gas line in front of her home. He said her condition was worse because of her having inhaled the sulphur gas which came from the pipe line. Dr. W. R. Castle stated that he examined appellee in September, 1937, and that he found her to be in a palsied condition,

and that she had heart trouble.  He stated that, while he did not know the history of her case, or how long she had been in that condition, in his opinion the inhaling of the sulphur gas would have made her condition worse. He said that the smell of the gas was very noticeable when he visited appellee's home, and in commenting upon the odor of the gas, he said:

"This stuff that I smelled was an old stinking gas, I was in a machine and I drove as fast as I could to get out of it—it was the doggondest smelling stuff I ever smelled—it smelled like rotten eggs and everything else mixed up with it."

The jury found for appellee in the sum of $750, and the judgment being appealed from was entered in accordance with that verdict.  Our examination of the record discloses that there was sufficient evidence to justify the submission of the case to the jury.  Furthermore, it is our view that the instructions given by the trial court were not substantially prejudicial to appellant's rights.

As to the service of summons, appellant is insisting that its service upon C. P. Hamilton, one of its employees, was improper, since Hamilton was not an officer of the ·Company, nor was he its process agent.  The Company's home office is in Ashland, Kentucky.  The summons was issued in the name of the Red Bush Production Company and the following return was made thereon: "Executed in full by delivering a true copy of this summons to the defendant, this 19th day of January, 1937."  On the 13th day of March, 1937, the trial court permitted the following amended return to be noted: "Executed by delivering a true and correct copy of the within summons to C. P. Hamilton, managing agent for the Red Bush Production Company in Johnson County, Kentucky, on the 19th day of January, 1937." Hamilton was in charge of appellant's pumping station and looked after its business and property in the section where gas was being pumped from the wells into its transportation line.  He did the hiring and firing of those who worked under him, and he .made up the time slips and sent them into Ashland.  He delivered the pay checks to the other employees.  He stated in answer to the question, "What are your duties under your employment with them?" "Well, I look after the whole thing out there; pipe line, station—anything they say for me to do."  H. B. Wood, president of the Red Bush Production Company, said in answer to the following question:

288

"Who is your manager out there?" "Mr. Hamilton." Under the circumstances we think the summons was properly served upon C. P. Hamilton as managing agent. Subsection 3, section 51 of the Civil Code of Practice; Cumberland Co. v. Lewis, 108 S. W. 347, 32 Ky. Law Rep. 1300; Kentucky Bonding Company v. Commonwealth, 178 Ky. 605, 199 S. W. 807.

Judgment affirmed.